1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  PAULA CHRISTENSEN,                           CASE NO. 1:10-cv-02243-LJO-SMS

10                        Plaintiff,

11       v.                                     FINDINGS AND RECOMMENDATIONS
                                                RECOMMENDING THAT THE COURT
                                                REMAND THIS CASE TO THE
12  MICHAEL J. ASTRUE,                          COMMISSIONER FOR
    Commissioner of Social Security,            ADDITIONAL PROCEEDINGS

13
                          Defendant.
14  _____/

15
16           Plaintiff Paula Christensen, by her attorneys, Law Offices of Jeffrey Milam, seeks judicial

17  review of a final decision of the Commissioner of Social Security ("Commissioner") denying her

18  application for disability insurance benefits (DIB) under Title II and for supplemental security

19  income  ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the

20  "Act").  The matter is currently before the Court on the parties' cross-briefs, which were

21  submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate

22  Judge.  Following a review of the complete record and applicable law, the undersigned

23  recommends that the Court remand this matter, pursuant to Sentence 6 of 42 U.S.C. § 405(g), for

24  the limited purpose of determining, through additional testimony of the vocational expert,

25  whether the Plaintiff has the residual functional capacity to perform any other work, in light of all

26  her functional limitations.

27  ///

28  ///

1    I.       **Administrative Record**

2         A.       **Procedural History**[1]

3         Plaintiff was insured under the Act through December 31, 2010.  On November 6, 2006,

4    Plaintiff applied for disability benefits pursuant to Title II of the Act.  On November 21, 2006,

5    Plaintiff filed a second application for supplemental security income ("SSI") under Title XVI.  In

6    both cases, Plaintiff alleged disability beginning October 12, 2005.  Her claims were initially

7    denied on May 4, 2007, and upon reconsideration, on October 2, 2007.  On December 1, 2007,

8    Plaintiff filed a timely request for a hearing.  Plaintiff appeared and testified at a hearing on April

9    13, 2008.  On January 5, 2009, Administrative Law Judge Stephen W. Webster denied Plaintiff's

10   applications.  The Appeals Council denied review on September 24, 2010.  On November 24,

11   2010, Plaintiff filed a complaint seeking this Court's review.

12        B.       **Factual Record**

13        **Plaintiff's testimony.**  Plaintiff (born November 8, 1960) completed a GED and a

14   secretarial course.  Although she had a driver's license, because she rarely left the house, she

15   rarely drove.  She had previously worked as an office assistant.

16        Plaintiff was able to perform her own personal care but was unable to perform household

17   chores such as laundry, cooking, and cleaning.  She rarely cooked other than warming food in the

18   microwave.  She also did light housework when she felt good.

19        Because of her panic attacks and the pain in her back, Plaintiff watched television, "maybe

20   too much."  She no longer read, and did not go to movies or church.

21        Plaintiff had agoraphobia and "pain from head to toe."  Her back pain was constant, and

22   although pain medication helped, the amount she could take was limited.  Her psychiatrist, Dr.

23   Giesbrecht handled her medications; Dr. Russom treated her pain.  Dr. Russom prescribed a

24   narcotic pain reliever, Percoset, which helped Plaintiff's pain, but "not enough."

25   ///

26

27        [1]  Plaintiff previously applied for disability benefits and was denied, in or about 1995.  The agency record
suggests that although the agency intended to apply the presumption set forth in *Chavez v. Bowen*, 844 F.2d 691, 693
28   (9th Cir. 1988), its inability to locate records of the earlier application precluded application of *Chavez*.

Plaintiff explained that she began seeing Dr. Russom after her husband no longer had a job that provided medical insurance.  Her former physician, Dr. Kalamkarian would not renew her prescriptions without seeing her in the office, but charged $100 for an office visit.

Plaintiff had never used illegal drugs.  She had stopped drinking when she began taking narcotic pain medication.

Plaintiff could sit about fifteen minutes and stand from fifteen to twenty minutes–just long enough to finish the dishes.  She could not finish cleaning the kitchen before she needed to lie down.  She got panic attacks four or five times weekly.  She treated the panic attacks by doubling her medication and lying down, often falling asleep.  According to Plaintiff, the panic attacks were exhausting, "kind of like a seizure," in that during an attack she was conscious but cloudy. Plaintiff could not identify what triggered her panic attacks.

**Husband's testimony.**  Plaintiff's husband, Gary Christensen, worked a part-time job that provided full-time hours to ensure the flexibility to leave the job site to care for his wife.  He described Plaintiff as having, over the course of a few years, gone from a "very independent, very self-supporting, very strong woman" to one who was frequently terrified and had panic attacks. Christensen cooked most meals and did the housework to "try to help her out."

According to Christensen, Plaintiff's panic attacks were severe and frequent, occurring three to five times weekly, on average, and as many as eight or nine times weekly.  They were sometimes triggered by men's voices that were similarly pitched to her ex-husband's voice, screaming, or pain, but often occurred for no apparent reason.  When Plaintiff experienced an attack, she removed any constricting clothing, retreated to her bed, curled into a ball, and trembled.  Ultimately, she fell asleep for several hours.  After an attack, Plaintiff had no energy and was "really out of it," like she was "about three-fourths dr[u]nk."

**Plaintiff's application for benefits.**  Plaintiff worked as an office assistant from January 2000 to October 2005.  Her job responsibilities included answering the telephone, dispatching, requisitions, computer work, filing, and running errands.  Except for an occasional box of computer paper, the heaviest weight Plaintiff lifted was ten pounds.

///

3

On a typical day, Plaintiff had difficulty waking up and moving around because of her pain. She began the day by having coffee and her medications. If she was very depressed and in pain, she did not dress, although she was physically able to dress herself. On her most stressful and painful days, she did little more than watch television and prepare very simple meals. Because she did not sleep well at night, she often slept during the day.

Plaintiff was able to perform light housework and laundry but no work such as ironing, repairs, or outside work. Her anxiety and pain kept her from leaving the house. She sometimes shopped with her husband for thirty to forty-five minutes, but had difficulty with crowds and pain. She was frequently impatient and often preferred to be alone. Nonetheless, she did socialize with her daughters and grandchildren.

In response to the agency's pain questionnaire, Plaintiff reported that she had experienced progressively worsening arthritis pain for many years. The worst pain, which was in her upper back, was never relieved. She quit work in October 2005 when the pain became too bad. A auto accident in February 2006 greatly increased her pain. Any type of movement aggravated the pain, which Plaintiff described as a severe ache with shooting pains throughout her entire back. The pain also spread to her shoulders, upper arms, and legs. It was so intense that it nauseated her and made her dizzy.

Plaintiff's medications included Fentanyl and Oxycodone for pain, and Fuoxetine, Imipramine, and Clonazapam for her anxiety attacks and agoraphobia. She experienced side effects including nausea, drowsiness, constipation, and irritability. Fentanyl, which is morphine-based, caused physical dependency. Plaintiff also used a TENS unit, but reported that it provided little pain relief. Despite taking strong pain relievers, Plaintiff's pain was rarely less than seven to eight on a scale of ten.

Plaintiff was fully capable of handling her own finances. She could read and follow instructions.

**Dr. Von Kaenel.** On October 28, and December 15, 2005, William Von Kaenel, M.D., administered intralaminar epidural steroid injections to Plaintiff for cervical disc displacement,

///

cervical radiculopathy, and cervical spine pain.  According to Plaintiff, the injections "didn't help much, I still have pain."  AR 237.

In a January 2, 2006 letter to Plaintiff's primary care physician, Jeffrey T. Gardner, M.D., Dr. Von Kaenel reported that Plaintiff experienced no overall benefit from the steroid injections. Von Kaenel's diagnosed:

> Ms. Christensen has had neck and upper extremity pain.  The epidural steroid injections have not been helpful.  She has a small disc protrusion at C4-C5 and C5-C6 suggestive of the source of axial or upper extremity of pain, but not causing nerve compression.

AR 265.

Explaining that epidural steroid treatments are not helpful for discogenic pain, Von Kaenel suggested a surgical referral to explore potential treatment for the discs with protrusions.

In January 2006, Dr. Gardner noted that Plaintiff told him that the second injection caused severe neck pain.

**Dr. Bernstein.**  In a March 8, 2006 letter to Dr. Gardner, clinical psychologist Robert M. Bernstein, Ph.D., prepared a report of his psychological assessment of Plaintiff following an automobile accident on February 16, 2006.  The accident occurred when a truck rear-ended Plaintiff's car, which was stalled at an intersection.  Plaintiff reported flashbacks of the accident, memory loss, nightmares, and increased fear and anxiety.

Plaintiff had a fifteen-year history of treatment of anxiety, agoraphobia, panic attacks, and depression, which had been treated with medication.  In January 2000, she returned to the work force.  After a new supervisor was hired in August 2005, Plaintiff experienced severe stress and was placed on disability in October 2005.  "Notwithstanding, [Plaintiff] reported that she did not have panic attacks at the time of the auto accident."  AR 274.  Bernstein diagnosed:

| | | |
|---|---|---|
| Axis I | 309.24 | Adjustment disorder with anxiety |
| | (309.81 | Posttraumatic stress disorder, acute–this diagnosis was applicable with the exception of the time period, which required one month following the accident.  It was anticipated that she would meet the criteria for this diagnosis if seen in one additional week.) |
| Axis II | V71.09 | None |
| Axis III | | Pain in back and neck and dull ache in legs |

Axis IV          Car accident

Axis V           current GAF, 50
                 highest GAF in past year, 60

AR 274-275.[2]

Dr. Bernstein concluded:

[Plaintiff] manifested a vulnerability for anxiety disorders, including panic attacks,
which had been largely controlled by medication and occurred infrequently prior to
the car accident. As a result of the car accident, [Plaintiff] experienced a
pronounced increase in anxiety and panic attacks, as well as fearfulness in a car.
She would benefit from cognitive-behavioral therapy to enhance her coping skills.
A psychiatric re-evaluation of the psychotropic medication regimen was warranted.
The prognosis was guarded given her premorbid level of functioning.

AR 275.

**Dr. Bhatia.** On May 1, 2006, neurologist Perminder Bhatia, M.D., of the Neuro-Pain

Medical Center, examined Plaintiff on behalf of attorney Darryl Freeman.[3] Dr. Bhatia described

Plaintiff as demonstrating normal general appearance and behavior; stream of talk, mood, and

content of thought; higher mental functions; gait; response to sensory stimulation; and language

skills. Her cranial nerves were normal. Plaintiff demonstrated 5/5 power in upper and lower

extremities, with normal tone, no atrophy, and no fasciculation. Her reflexes were bilateral and

symmetrical. Movements of her cervical spine were mildly restricted. Bhatia assessed:

This is a female who has a history of neck pain, shoulder pain, and arthritis but
then she had a motor vehicle accident and had whiplash injury to the neck and also

---

[2] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall
functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of
Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and
occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in
functioning due to physical (or environmental) limitations." Id. at 34. The first description in the range indicates
symptom severity; the second, level of functioning. Id. at 32. In the case of discordant symptom and functioning
scores, the final GAF rating always reflects the worse of the ratings. Id. at 33.
   GAF 50 is at the top of the range GAF 41-50, which indicates "[s]erious symptoms (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e.g. no friends, unable to keep a job)." Id. at 34.
   GAF 60 is at the top of the range GAF 51-60, which indicates "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning
(e.g., no friends, unable to keep a job)." Id. at 34.

[3] Mr. Freeman's role, if any, in the administrative proceedings is not clear. Other than in this and similar
evaluations, his name does not appear in the administrative record. Plaintiff appeared *pro se* at the administrative
hearing and declined the ALJ's offers to adjourn to permit her to secure representation. It is possible that Mr.
Freeman represented Plaintiff in claims arising from her 2006 auto accident.

1   complaining of since the muscle aches in the cervical and lumbar area.  She does
2   have mild cervical and lumbar paravertebral muscle spasm with mildly restricted
    movements of the cervical spine.  I do [not] think there is any other evidence of
3   any other injury.  Mainly, we are dealing with cervical lumbar sprain,
    musculoskeletal injury after the accident.

4       AR 278.

5       Dr. Bhatia advised Plaintiff to continue her course of treatment, including physical

6   therapy, but switched her Neurontin prescription to Lyrica.  He did not recommend MRI or EMG,

7   but planned to again see Plaintiff if she was not better in three months.  The administrative record

8   does not indicate that Plaintiff saw Dr. Bhatia again.

9       **Physical therapy.**  Plaintiff received physical therapy following her auto accident.  On

10  April 25, 2006, physical therapist Jeffrey Lawson noted that Plaintiff's attendance was sporadic

11  and that she was not consistently compliant with an independent home program that she should

12  have performed daily.  Plaintiff blamed babysitting and the time required.  Lawson suggested that

13  Plaintiff would benefit from a structured exercise program at a local gym, such as "Curves."

14  Noting Plaintiff's improvement at physical therapy, Dr. Gardner also opined that Plaintiff would

15  benefit from physical conditioning, but he didn't think Plaintiff would follow up on the

16  recommendation.

17      **Dr. Gardner.**  Magnetic resonance imaging of Plaintiff's lumbar spine on June 15, 2006,

18  revealed mild degenerative changes at L4-L5 and L5-S2, but "no evidence of any sizable disc

19  protrusions or other abnormality."  AR 281.

20      **Dr. Giesbrecht.**  Psychiatrist M. Giesbrecht treated Plaintiff from August 2006 to

21  December 2007.  The  treatment notes are generally handwritten and largely illegible.  Dr.

22  Giesbrecht consistently noted anxiety, depression, and chronic pain.  On December 28, 2006,

23  Plaintiff reported that she continued to be disturbed by threats made by the last supervisor at her

24  clerical job. AR 370.

25      On at least three occasions, Dr. Giesbrecht wrote letters in which he opined, "Based on the

26  clinical presentation and to the best of my knowledge, this patient is incapable of working from a

27  psychiatric point of view."  AR 343, 347, 365.  Other than indicating a diagnosis of mood disorder

28  ///

not otherwise specified, Dr. Giesbrecht's opinion letters included no other information or opinions.

On September 19, 2006, Dr. Giesbrecht certified to the Employment Development Department that Plaintiff had an anxiety disorder that impaired her concentration and attention, and caused excessive worry, depression, and thoughts of assault.  Plaintiff's return to work was delayed by the severity of her symptoms and multiple psychosocial stressors.

In a November 7, 2006 opinion letter to Sun Life Assurance, Giesbrecht indicated that Plaintiff experienced severe and near-constant "endorsements of depression and anxiety."  She experienced panic symptoms; could not tolerate frustration; was irritable and cried frequently; had recurrent insomnia; and had severely impaired attention and concentration.  Giesbrecht opined that Plaintiff was "temporarily totally disabled" but was estimated to be able to return to work on February 6, 2007.

**Dr. Russom.**  The record includes copies of prescriptions for Oxycontin and Duragesic patches (among other medications) that family practitioner Jill Russom, M.D., provided to Plaintiff from January 2007 through September 2008.  Plaintiff's interactions with Russom's office centered on Plaintiff's recurring need to renew her prescriptions.  A March 2008 entry noted that Plaintiff had lost her Fentanyl prescription for the second time.  Office staff directed Plaintiff to file a police report.  Thereafter, Plaintiff's pain medications were only prescribed for two weeks at a time.  In September 2008, Plaintiff became verbally abusive with Dr. Russom's office staff over their request that she pay a $40 fee for completion of documentation for Plaintiff's social security application.

**Dr. Michiel.**  On March 25, 2007, psychiatrist Ekram Michiel, M.D., evaluated Plaintiff as an agency consultant.  Plaintiff told Michiel that her problems began with the February 2006 auto accident.  She was under the care of a psychiatrist who prescribed Klonopin and Imipramine. Michiel diagnosed:

| | |
|---|---|
| Axis I | Anxiety disorder NOS |
| | Depressive Disorder NOS |
| Axis II | Deferred |

Axis III        Chronic pain

Axis IV        Stressors: Health condition

Axis V         Global Assessment of Functioning: 60

AR 297.

Michiel opined that Plaintiff was "able to maintain attention and concentration and to carry out simple job instructions"; "to relate and interact with coworkers, supervisors and the general public"; and "to carry out an extensive variety of technical and/or complex instructions." AR 297.

**Dr. Wong.**  On April 10, 2007, medical consultant E.E. Wong prepared a physical residual functional capacity assessment for Plaintiff.  Wong opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand or walk for six hours in an eight-hour work day; could sit about six hours in an eight-hour work day; had unlimited ability to push and pull; could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could occasionally climb ladders, ropes, and scaffolds; had unlimited ability to handle finger, handle, and feel; but had limited ability to reach in all directions.

**Dr. Middleton.**  On April 26, 2007, psychologist A.H. Middleton, Ph.D., performed the psychiatric review technique.  Middleton opined that Plaintiff demonstrated affective and anxiety-related disorders, specifically major depression with anxiety.  Middleton opined that Plaintiff had mild restrictions of daily living; mild difficulties in maintaining concentration, persistence and pace; moderate difficulties in maintaining social functioning; and no evidence of repeated episodes of decompensation.  In Plaintiff's mental residual functional capacity assessment, Middleton opined that Plaintiff had no limitations of mental functioning except for moderate limitations in her ability to interact appropriately with the general public.  Accordingly, Middleton made no recommendations except that Plaintiff required reduced work with the general public.

**Comprehensive Pain Management Center.**[4]  Berj T. Kalamkarian, M.D. and physician's assistant William Johncox, PA-C, initially evaluated Plaintiff on November 16, 2006, at the

---

[4]  Medical records sometimes identify Dr. Kalamkarian's clinic as San Joaquin Center for Pain Management.

request of attorney Darryl Freedman and referring physician Michael Stubblefield, M.D.  Plaintiff complained of chronic pain of her neck, left shoulder, left arm, low back, and bilateral lower extremities.  Her arms and lower extremities occasionally tingled.  She was receiving physical therapy; her physical therapist told her she had soft tissue damage. Plaintiff characterized her pain as "numbing, stabbing, shooting, cold, sore, sharp, dull, tight, heavy, intense, transient, constant, radiating, annoying, severe, unbearable, and excruciating."  AR 336.  She reported that it was aggravated by "cold, damp, weather changes, physical activity, movement, sleep, rest, lying down, sitting, standing, tension, fatigue, sneezing, and coughing."  AR 336.

Dr. Kalamkarian described his physical examination:

Pain was rated 8-9 on a scale of 10.  Inspection of the head and neck revealed no deformities or masses.  There were no adenopathy and no deviation in the neck. Sclera and oral mucosa were clear.  No icterus.  Pulses on all four extremities palpable.  Range of motion in the neck was very limited both with flexion, extension, lateral bending, and rotation.  The patient claims increased pain in the right neck radiating down to the shoulder and to the right arm.  Palpation of the neck revealed sensitivity to touch and pressure over the spinous processes of the lower cervical spine.  There were tense trigger points of the trapezius and levator scapula musculature bilaterally.  Gait was normal.  Heel walking was with increased pain in the lower back with pulling sensation.  Tiptoe walking was unremarkable.  Palpation of the back was tender in the lumbosacral region over the sacroiliac joints bilaterally.  Range of motion of the lumbar spine was minimal both with flexion, extension, lateral bending, and rotation with increased pain. Straight leg raising in supine position at 90 degrees increased the pain in the lower back.  No nerve tension signs.  Reflexes were symmetrical and physiologic on all four extremities.  Sensory was preserved.  Upon forceful extension of the lower extremities there were jerky movements of the whole leg bilaterally.  There were no pathological reflexes.

AR 337.

Dr. Kalamkarian diagnosed degenerative disease of the cervical spine and chronic cervicalgia, opining that it was likely present before her car accident but that the accident aggravated her condition.  He suggested injectable modalities such as lumbar facet blocks and epidural steroid injection, continued physical therapy, and a surgical referral.  Plaintiff refused all three suggestions, indicating that "[s]he wanted to focus on only medical treatment to obtain medications for pain."  AR 338.  Dr. Kalamkarian prescribed Duragesic patches and Oxycodone.

Kalamkarian and Johncox re-evaluated Plaintiff on March 19, 2007.  Plaintiff complained of continuous chronic total body pain, starting from the neck, left upper extremity, lower back,

1  and both lower extremities.  She rated her pain ten on a one-to-ten scale.  Her neck, shoulders, and

2  lumbosacral region were severely sensitive to palpation.  Flexion and extension of the neck were

3  limited; lateral bending and rotation were also painful.  Kalamkarian planned to perform lumbar

4  facet blocks to relieve Plaintiff's pain and permit her to discontinue using opoid analgesics.  He

5  referred Plaintiff for the medical imaging that was the first step.  The administrative record

6  includes no documentation that Plaintiff obtained the necessary imaging.

7         Kalamkarian and Johncox again re-evaluated Plaintiff on July 3, 2007.  Plaintiff, who

8  complained of chronic intractible neck pain, left shoulder pain, low back pain, and bilateral lower

9  extremity pain, rated her pain as 9 on a scale of 1 to 10.  Examination revealed that cervical range

10  of motion was reduced 50 per cent on rotation and lateral flexion, and twenty per cent on flexion

11  and extension.  Her grip strength was 5/5.  Plaintiff's paravertebral muscles of the cervical spine

12  were tender, especially on the left.  Kalamkarian diagnosed degenerative disc disease of the

13  cervical and lumbar spine with chronic pain and prescribed Percoset and Duragesic patches.

14  Because Plaintiff appeared anxious and reported experiencing panic attacks, Dr. Kalamkarian

15  referred Plaintiff to a psychiatrist.

16         **Dr. Reddy.**  In her case analysis, agency physician S.V. Reddy, M.D., noted that Dr.

17  Kalamkarian declined to return a medical source statement.  Dr. Reddy wondered whether

18  Plaintiff's claims of total body pain and her treating physician's request that Plaintiff sign a pain

19  contract suggested possible narcotic dependence, particularly in light of the mild spinal changes

20  shown on the June 2006 MRI.  Ultimately, in light of Kalamkarian's failure to respond to the

21  agency's requests for a statement, Reddy again reviewed his notes and concluded that they

22  indicated that Plaintiff's narcotic intake resulted from narcotic dependence, not pain.

23         **Vocational expert.**  Vocational expert Cheryl Chandler testified that Plaintiff's basic

24  office skills were transferable to other general clerical positions and working with people.  For the

25  first hypothetical question, Judge Webster directed Chandler to assume a hypothetical person of

26  Plaintiff's age, education, and work history, who was able to lift twenty pounds occasionally and

27  ten pounds frequently, and sit, stand, or walk for six hours in and eight hour work day, but was

28  limited to simple, routine, and repetitive tasks.  Chandler opined that the hypothetical individual

could not perform Plaintiff's past relevant work.  According to Chandler, such a person could perform jobs with a light, unskilled residual functional capacity.  Examples of such jobs included food prep workers (DOT No. 311.477-014), 32,900 available jobs; laundry workers at the light level (DOT No. 302.687-010), 57, 500 jobs; ticket taker (DOT No. 344.667-010), 10,700 jobs.

For the second hypothetical question, the ALJ directed Chandler to assume that the individual described in the first hypothetical question could have only occasional contact with supervisors, co-workers, and the public.  Chandler first confirmed that the hypothetical person still could not perform Plaintiff's past relevant work.  She then opined that jobs would still be available in the regional or national economy for the hypothetical person, but that fewer jobs would be available for such a person than for the first hypothetical person.  Chandler opined that available jobs would include building cleaners working after hours (DOT No. 381.687-0130), 12,000 jobs; ground maintenance workers (DOT No. 403.687-022), 6500 jobs; and hand packagers at the light level (DOT No. 920.687-018), 15,000 jobs.

Third, the ALJ directed Chandler to assume the same hypothetical person with the additional condition that the person could not complete an eight-hour day or a forty-hour week. Chandler opined that the hypothetical individual could neither perform Plaintiff's prior work nor any other work in the national or regional economy.

For each response, Chandler identified that her response was consistent with the *Dictionary of Occupational Titles*.

Finally, Plaintiff's husband asked Chandler whether any jobs would be available for a person with a disability such as Plaintiff's, that is, to be able to leave work at a moment's notice because of a panic attack; to be able to not come in to work because of a panic attack; and to tolerate a panic attack in the midst of co-workers or customers.  Chandler opined that no employer would tolerate such as disability on a steady basis since it would result in the employee missing more than the usual amount of permitted time.

## II.  Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment

which has lasted or can be expected to last for a continuous period of not less than twelve months.
42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of
such severity that he or she is not only unable to do his or her previous work, but cannot,
considering age, education, and work experience, engage in any other substantial gainful work
existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated
regulations prescribing a five-step sequential process for evaluating an alleged disability.  20
C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following
questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the
alleged onset date of October 12, 2005.  Her severe impairments, arthritis and anxiety disorder,
did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1.  Plaintiff had the residual functional ability to lift and carry 20 pounds occasionally
and 10 pounds frequently; to sit, stand, and walk six hours in an eight-hour work day; and to
perform simple routine repetitive work.  She was unable to perform her past work as a rehab
counselor.  Plaintiff retained the ability to perform light work with certain limitations.
Accordingly, the ALJ concluded that Plaintiff was not disabled.

1  **III.    Scope of Review**

2          Congress has provided a limited scope of judicial review of the Commissioner's decision

3  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

4  a court must determine whether substantial evidence supports the Commissioner's decision.  42

5  U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

6  402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

7  1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

8  as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

9  be considered, weighing both the evidence that supports and the evidence that detracts from the

10 Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

11 evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

12 *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

13 determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

14 the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

15 *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

16         The scope of review requires this Court to consider the record as a whole, examining both

17 the evidence supporting the ALJ's decision and the evidence that does not.  When it did so, the

18 Court discovered a record more extensive than the documents on which the ALJ had relied, which

19 portrayed the claimant very differently than the ALJ did.  When considered in light of applicable

20 law, the Court concludes that the ALJ erred in denying Plaintiff benefits.

21 **IV.    Credibility**

22         Plaintiff contends that Judge Webster failed to give "good reasons" for finding that she

23 and her husband lacked credibility.   She argues that the ALJ ignored medical support for her

24 credibility, such as Dr. Giesbrecht's observations of slowed speech and retarded movement, and

25 her compliance with treatment.  The Commissioner responds that the ALJ's findings that

26 Plaintiff's allegations of her symptoms and limitations were supported by substantial evidence.

27 ///

28 ///

After carefully examining the medical records include within the agency record, the ALJ stated:

> After careful consideration of the evidence, I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The claimant testified that she is able to care for her personal needs, but does not cook. She occasionally does laundry or cleans the house if she feels good. She claims she gets panic attacks 4-5 times a week and has pain from her head to her toes due to her arthritis. Her husband verified her panic attacks. The claimant also submitted a written statement indicating that despite her pain, she can take care of her personal needs, take care of her pets, prepare simple meals, do light housework and laundry, drive, shop, lift 5 pounds, walk 10 minutes, pay attention for one hour, and handle a checking and savings account. Her hobbies include reading and watching television daily, and spending time with her children and grandchildren 2-3 times a week. Yet she claims in the same statement that she cannot function due to her chronic pain, anxiety, depression, and agoraphobia. She rates her pain a 4-5 to 7-8 out of 10, relieved by rest. The claimant told Dr. Michiel that despite her alleged symptoms, she is able to cook, do household chores, and visit with relatives. The claimant's husband submitted a consistent written statement and in addition stated the claimant shops twice a week for up to 1 hour, visits with family, and talks with friends. He also stated she can lift 10 pounds, walk 200 yards, sit 20-30 minutes, and pay attention 20-30 minutes.
>
> In sum, the above residual functional capacity assessment is supported by the overall objective medical evidence for the reasons discussed above. While the claimant has a documented physical and mental impairment, she is able to perform her regular activities of daily living. Her anxiety and panic attacks do not prevent her from engaging in social activities and she admits her pain is controlled with medications. Therefore, it does not appear her impairments would prevent her from working within the residual functional capacity provided above.

AR 22 (*citations to hearing exhibits omitted*).

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific

reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see also Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and

///
///

1    conduct, daily activities, and "unexplained, or inadequately explained, failure to
     seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603;
2    *see also Thomas*, 278 F.3d at 958-59.

3    *Orn*, 495 F.3d at 635.

4        Judge Webster rejected Plaintiff's testimony based on multiple reasons well supported by

5    facts in the record.  Plaintiff's testimony, and the supportive testimony of her husband, concerning

6    her daily activities and functional abilities was inconsistent with her claims of chronic intractible

7    pain.  Plaintiff and her husband unequivocally testified to Plaintiff's ability to perform her own

8    personal care, perform light housework, drive, shop, maintain social and family relationships, and

9    conduct financial affairs.  Despite her claimed intractible pain, Plaintiff and her husband depicted

10   her as able to manage a variety of physical activities.

11       In addition, the extent of the pain that Plaintiff claimed to experience was inconsistent

12   with objective medical assessments of her physical condition.  Multiple physicians and other

13   medical professionals identified Plaintiff's pain as relating to muscle strain and indicated that it

14   could be relieved with physical therapy and physical activity.  Magnetic resonance imaging and

15   similar procedures revealed degenerative changes in Plaintiff's spine, but these were so mild as to

16   be an unlikely source of her claimed pain.

17       As the ALJ observed, Plaintiff was not only capable of physical activity but had been

18   advised to move more.  Her physical therapist emphasized Plaintiff's improvement with therapy

19   despite her sporadic participation in the prescribed therapy and failure to perform her prescribed

20   home routines, and recommended that she continue physical exercise by participating in a local

21   exercise program.  Dr. Gardner agreed that Plaintiff needed to continue her home exercise

22   program and join a gym.  Dr. Bhatia also advised physical therapy and imposed no restrictions on

23   her activity.

24       Judge Webster also noted that Plaintiff steadfastly resisted all alternative treatments for her

25   back pain except for narcotic pain relievers.  Despite initially stating that the steroid injections

26   administered by Dr. Van Kaenel reduced her pain from ten to five, Plaintiff ultimately claimed

27   that the injections did not relieve her pain.  She refused pain specialist Dr. Kalamkarian's

28   recommendations of injections, lumbar facet blocks, physical therapy, and surgery consideration,

1    insisting that treatment focus only on medication.  Later, when she again reported her pain had

2    reached ten, she failed to follow Dr. Kalamkarian's plan for a bone scan, lumbar facet blocks, and

3    discontinuance of addictive opioid medications, claiming that she lacked insurance and could not

4    afford it.  Meanwhile, despite her subjective complaints, her doctors' objective testing revealed

5    such things as normal gait and walking within normal limits.  On various occasions, Dr.

6    Kalamkarian noted that Plaintiff's pain was well-controlled with medication and that Plaintiff was

7    in no obvious distress.  Dr. Kalamkarian imposed no limitations.

8          After Plaintiff switched from Dr. Kalamkarian to Dr. Russom, ostensibly because Dr.

9    Kalamkarian's appointment fees were too expensive, she focused solely on treatment with

10   Oxycodone and Percoset.  Russom's medical records consist largely of prescriptions for those

11   drugs.  Plaintiff missed multiple appointments but frequently called requesting prescription refills.

12   When Plaintiff claimed for the second time that she had lost her prescription, Dr. Russom limited

13   Plaintiff to only two weeks of the painkillers at a time.

14         Plaintiff similarly focused solely on medication for her mental health problems,

15   disregarding Dr. Bernstein's recommendation for cognitive-behavioral therapy and re-evaluation

16   of her psychotropic medications.

17         Substantial evidence supported Judge Webster's assessment of the credibility of Plaintiff

18   and her husband.

19   **V.    Medical Opinions**

20         Plaintiff contends that the ALJ erred in rejecting Dr. Giesbrecht's opinions as a treating

21   physician.  The Commissioner responds that the ALJ properly relied on Dr. Michiel's assessment

22   and rejected Dr. Giesbrecht's unsupported conclusory opinion.

23         In his analysis of medical records within the agency record, Judge Webster examined both

24   Dr. Giesbrecht's treatment notes and disability letters, and Dr. Michiel's consultative opinion.

25   The ALJ gave less weight to the opinion of Dr. Giesbrecht than to Dr. Michiel, explaining:

26         Greater weight is given to the opinion of psychiatric consultative examiner Dr.
           Michiel since he actually examined the claimant and his opinion is most consistent
27         with the overall medical evidence of record.  The opinion of the claimant's treating
     ///

28   ///

physician, Dr. Giesbrecht is given less weight; he opines the claimant is disabled, yet he does not explain what psychological symptoms prevent the claimant from working.

AR 21.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p. The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831.

///

1    Even though the treating physician's opinion is generally given greater weight, when it is

2    contradicted by an examining physician's opinion that is supported by different clinical findings

3    the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The

4    ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence,

5    interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ must tie the

6    objective factors or the record as a whole to the opinions and findings that he or she rejects.

7    *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  The ALJ need not give weight to a

8    conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113

9    (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

10    Here, Dr. Giesbrecht's opinion was contradicted by the assessments of Dr. Michiel, an

11    examining physician, and by agency physicians.  As the ALJ observed, Dr. Michiel set forth his

12    opinion in the context of his examination of Plaintiff and explained his reasoning.  Aside from

13    reciting a diagnosis in several of his letters that pronounced Plaintiff to be disabled, Dr.

14    Giesbrecht neither based his opinion on his examination and treatment of Plaintiff nor explained

15    his reasoning.

16    An ALJ is not required to accept the opinion of any physician, including a treating

17    physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings.

18    *Thomas*, 278 F.3d at 957. When a treating physician's medical opinion is contradicted by the

19    opinion of another physician, the ALJ is required to do no more than provide specific and

20    legitimate reasons for discounting the treating physician's opinion.  *Bray v. Commissioner of*

21    *Social Security Admin.*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009).  The ALJ did so here.

22    **VI.**    **Postural and Reaching Limitations**

23    Plaintiff contends that the ALJ erred in failing to include within the residual functional

24    capacity and hypothetical questions to the vocational expert Plaintiff's postural limitations and

25    limited reaching.  The Commissioner acknowledges that the ALJ failed to include postural and

26    reaching limitations but contends that the error was harmless.

27    At step 5, the burden of proof shifts to the Commissioner to show that a claimant can

28    perform work other than his or her past relevant work.  20 C.F.R. § 404.1520(f); *Bowen v.*

1  *Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  In the physical residual functional capacity assessment,

2  Dr. Wong opined that, due to Plaintiff's limited range of neck motion, she could only occasionally

3  climb ladders, ropes, and scaffolds, and could only occasionally work overhead.  AR 301.  The

4  ALJ did not include these restrictions in his hypothetical questions to vocational expert Cheryl

5  Chandler, but acknowledged them in the hearing decision (AR 21).

6          "In order for the testimony of a VE to be considered reliable, the hypothetical posed must

7  include 'all of the claimant's functional limitations, both physical and mental' supported by the

8  record."  *Thomas*, 278 F.3d at 956, *quoting Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995).

9  *Accord Williamson v. Commissioner of Social Security*, 438 Fed.Appx. 609, 610 (9th Cir. 2011).

10  The ALJ may not omit a claimant's non-exertional limitations in the hypothetical questions.  *Id.*

11  Omission of any of a claimant's limitations is error.  *Valentine v. Commissioner of Social Security*

12  *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  Similar error in prior cases has not been considered

13  harmless.  When an ALJ's hypothetical question to the vocational expert failed to reflect all of the

14  claimant's limitations, the expert's opinion has no evidentiary value to support the ALJ's

15  decision.  *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir. 1988).  In such cases, the District Court

16  must remand the case to the Commissioner for reconsideration.  *Id.*

17  **VII.**     **Conclusion and Recommendation**

18          Because Judge Webster failed to include all of Plaintiff's functional limitations,

19  specifically her limitations on reaching and climbing, in his hypothetical questions to the

20  vocational expert, the undersigned recommends that the Court remand this matter to the

21  Commissioner, pursuant to Sentence 6 of 42 U.S.C. § 405(g), for the limited purpose of

22  supplementing the record with the vocational expert's testimony regarding Plaintiff's residual

23  functional capacity to perform any work other than her relevant prior work.

24          These Findings and Recommendations will be submitted to the Honorable Lawrence J.

25  O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C § 636(b)(1).  On or

26  before June 25, 2012, any party may file written objections with the Court.  The document should

27  ///

28  ///

be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that, by failing to file objections within the specified time, she may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   May 30, 2012**              /s/ Sandra M. Snyder
                                UNITED STATES MAGISTRATE JUDGE